1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   J.N.,                               Case No.  21-cv-03736-JCS

              Plaintiff,                **ORDER GRANTING PLAINTIFF'S**
8                                       **MOTION FOR SUMMARY**
       v.                               **JUDGMENT, DENYING**
9                                       **DEFENDANT'S MOTION FOR**
                                        **SUMMARY JUDGMENT, REVERSING**
10  KILOLO KIJAKAZI,                    **THE DECISION OF THE**
                                        **COMMISSIONER AND REMANDING**
              Defendant.                **FOR AWARD OF BENEFITS**
11

12                                      Re: Dkt. Nos. 29, 30

13  **I.     INTRODUCTION**

14        On April 8, 2015, Plaintiff J.N.[1] applied for supplemental security income ("SSI") under

15  Title XVI of the Social Security Act.   The claim was denied initially and upon reconsideration,

16  and Arthur Zeidman, an administrative law judge ("ALJ"), held a hearing on March 13, 2018.  The

17  ALJ issued an unfavorable decision on May 14, 2018.  Plaintiff sought Appeals Council review of

18  the ALJ's decision and the Appeals Council granted review on April 25, 2019.  The ALJ

19  conducted a second hearing on December 5, 2019, and issued a second unfavorable decision on

20  March 2, 2020. Plaintiff again sought Appeals Council review and the Appeals Council denied

21  review on September 28, 2020. Plaintiff subsequently commenced this action for judicial review

22  pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

23         Plaintiff moves for summary judgment on his claim that Defendant Kilolo Kijakazi,

24  Acting Commissioner of Social Security (the "Commissioner"), erred in denying J.N.'s

25  application for SSI. The Commissioner filed a cross-motion for summary judgment seeking to

26

27  _____

28  [1] Because opinions by the Court are more widely available than other filings and this Order
    contains potentially sensitive medical information, this Order refers to Plaintiff using only his
    initials.

United States District Court
Northern District of California

affirm that decision. For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and remands for calculation and award of benefits.[2]

## II.     REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A.     The Five-Step Framework

SSI is available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).[3] If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations'

---

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

[3] The Court cites the regulations that govern applications for disability insurance benefits under Title II of the Social Security Act because the parallel SSI regulations are virtually identical.

United States District Court
Northern District of California

twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform.  *Id.*

United States District Court
Northern District of California

**B.   Supplemental Regulations for Determining Mental Disability**

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2)  interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520a(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    This evaluation process is to be used at the second and third steps of the sequential

2    evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

3    adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

4    criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

5    steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the

6    claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

7    the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §

8    404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

9    sequential process [and] requires a more detailed assessment by itemizing various functions

10   contained in the broad categories found in paragraphs B and C of the adult mental disorders

11   listings in 12.00 of the Listing of Impairments . . . . "  Social Security Ruling 96-8p, 1996 WL

12   374184, at *4.[4]

### C.    Additional Step Addressing Substance Use Disorder

14         Even if a claimant is determined to be disabled pursuant to the five-step framework

15   discussed above, a claimant is not eligible for Social Security benefits if "drug addiction or

16   alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §

17   416.935(a). The "key factor" in making this determination is whether the claimant would still be

18   disabled if the claimant stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(1). The claimant's

19   drug or alcohol use is only a material contributing factor to the determination of disability if the

20   remaining limitations would not be disabling. *Id*. § 416.935(b)(3).

---

[4] SSRs, according to the governing regulations, "are binding on all components of the Social Security Administration" and "represent precedent[ial] final opinions and orders and statements of policy and interpretations" of the Social Security Administration ("SSA"). 20 C.F.R. § 402.35(b)(1); *see also Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting the function of SSRs). "SSRs reflect the official interpretation of the SSA and are entitled to 'some deference as long as they are consistent with the Social Security Act and regulations.'" *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) (quoting *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)). SSRs do not carry the "force of law," but they are binding on the ALJs nonetheless. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

III.     **FACTUAL BACKGROUND**[5]

A.     **Education and Employment History**

J.N. is 55 years old and completed twelfth grade.  Administrative Record ("AR") 102.  J.N. has been incarcerated on and off throughout adulthood, with the first record of incarceration dating back to 1986, when he was 19 years old.  AR 117, 1501. He has no past relevant work. AR 38. J.N. started using cocaine, methamphetamines and alcohol as a teenager and has been to 10-15 rehabilitation programs. AR 1927.

B.     **Medical History**[6]

There are a number of references in the record to counseling J.N. received as a teenager, when he was diagnosed as being suicidal and depressed.  *See, e.g.,* AR 576, 677, 1508. As an adult, however, it appears that J.N. has received mental health treatment largely while incarcerated or in connection with his parole and the administrative record contains treatment records for those periods, dating back to 1986.  AR 1501.  Although the Court does not attempt to provide a comprehensive summary of these voluminous records, it notes that J.N.'s longstanding and persistent mental illness is well-documented in them.  *See, e.g.,* AR 954 (4/7/1995 San Quentin

---

[5] While Plaintiff provided a statement of the administrative record, as required under the Court's July 27, 2021 Order, the Commissioner did not.  The Court adopted this requirement not only to assist it in evaluating the parties' arguments but, more importantly, to ensure that the parties conduct a fulsome review of the record in connection with their motions and do not (in the case of the Commissioner, at least) simply rely on the ALJ's characterization of the record.  It is apparent that the Commissioner did *not* conduct a comprehensive review of the record and *did* rely on the ALJ's characterization of the record.  Not only did she fail to provide the required statement of the record (or address the statement of the record Plaintiff provided) but she submitted a brief that contained *no* statement of facts, instead citing to the ALJ's description of the record. *See* Defendant's Motion at 2 (stating as the entire Statement of Facts: "The ALJ provided a summary of the medical and testimonial evidence in his decision (AR 30-49). Where specific facts serve to illustrate or illuminate an issue, they are discussed further in the Argument section below.").  Further, the citations to the record in the analysis section of the Commissioner's brief largely parrot the evidence cited by the ALJ and the Commissioner failed to address much of the evidence and many of the arguments in J.N.'s summary judgment motion.  The Court has independently reviewed the record and finds that Plaintiff's characterization of the record in his Statement of the Administrative Record is accurate.  In any event, the Commissioner has waived any argument that Plaintiff's Statement of the Administrative Record is inaccurate.
[6] While J.N. alleges both physical and mental impairments, his challenges to the ALJ's decision relate to his mental impairments and therefore the Court's summary focuses on J.N.'s mental impairments.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  psychological evaluation listing Axis II diagnosis of anti-social personality disorder); 1402

2  (7/06/2001 intake form indicating "psychiatric disorder" "possible depression"); 538 (12/11/2008

3  initial screening by Criminal Justice Mental Health Program reporting a history of schizophrenia

4  and complaints by J.N. that he was hearing voices); 546 (8/20/2009 psychiatry MD initial note

5  diagnosing methamphetamine dependence and "possible Intermittent Explosive Disorder");  551

6  (3/27/2012 treatment note by LCSW Paul Wensley diagnosing mood disorder and cocaine abuse);

7  553 (12/1/2012 treatment note by LCSW Paul Wensley listing diagnoses of Impulse Control

8  Disorder NOS and cocaine abuse, reporting that J.N. stated he has "violent tendencies" and

9  "go[es] into rages"); 578 (9/13/2013 treatment note by LMFT Seth Page observing that J.N. was

10  "a little hyper" and "having problems concentrating"); 977 (11/22/2013 treatment note describing

11  J.N. as having a history of impulse control disorder NOS and polysubstance dependance and

12  prescribing Remeron); 1507-1508 (2/17/2016 treatment note by SPSW M. Waggoner observing

13  paranoid ideation, listing diagnosis of "schizoaffective disorder depressive type[,]" describing his

14  anxiety level as "high" and noting that J.N. complained of auditory hallucinations, "usually when

15  [he's] on dope but not always");  1002 (6/17/2016 treatment note describing "[history] of mood

16  [disorder] nos, [rule-out] bipolar [disorder], amphetamine [dependence] [and] polysubstance

17  [dependence]"; noting J.N.'s complaints about auditory hallucinations, "racing thoughts"; and

18  listing current medications as Depakene and Zyprexa); 1519 (4/20/2017 treatment note by NP

19  Kevin Lagor describing J.N. as "fidgety, restless, [loses] his train of thought[,]" "depressed,

20  isolates, paranoia, quick to anger, [auditory hallucinations], difficult with relationships and with

21  the community[,]" and noting that "he has had long periods of sobriety in the past and his

22  [symptoms] of depression and mania persisted").

23          One prison clinician, "Sheinin,"[7] states in an evaluation dated April 11, 2014, that J.N.'s

24  "[s]ubstance use appears to be the primary factor contributing to legal, medical and mental health

25  difficulties." AR 759.  They go on to state, however, that "[w]hile it is not clear what the clinical

26  picture would look like without substance use it seems likely that the [inmate] has a mood

27

28  _____
[7] The record does not list a title or qualifications of this individual.

1    disorder, provisionally diagnosed as [major depressive disorder], recurrent, mild."  *Id.*

2          The record also contains a number of other psychological evaluations of J.N., cited in the

3    ALJ's decision, which the Court summarizes below.

### 1.   Dr. Sack (state agency consultative examiner)

5          Philip A. Sack, M.D., conducted a psychiatry consultative examination and completed an

6    evaluation dated June 15, 2015. AR 677-79.  He writes that J.N. "[c]omplains about longstanding

7    depression, anxiety and polysubstance dependence and is currently homeless" and that he "has

8    been mostly sober . . . saw a counselor in high school for suicidality . . . denied auditory or visual

9    hallucinations." AR 677.  Dr. Sack found that J.N.'s ability to "maintain appropriate levels of

10   concentration, pace and persistence necessary to perform one or two step simple tasks" was

11   "intact" but that his "ability to maintain adequate persistence to perform complex tasks [was]

12   mildly impaired" and that his ability to "tolerate usual stress and pressures associated with day to

13   day work activity [was] moderately impaired."  AR 678. He listed J.N.'s Axis I diagnoses as

14   "Polysubstance dependence; Major depressive disorder; Generalized anxiety disorder; Rule out

15   learning disorder, ADD, ADHD."  AR 678.

### 2.   Dr. Rovno (state agency consultant, non-examining)

17         On July 13, 2015, state agency consultant David Rovno, M.D. concluded that J.N. was not

18   disabled based only on review of the record, writing that "[s]ubstance abuse is documented, but a

19   [Drug and Alcohol Abuse] material determination is not required."  AR 160.

### 3.   Dr. Ratto (state agency consultant, examining)

21         On September 30, 2015, Rosemary Ratto, PhD, conducted a psychological evaluation, of

22   J.N. AR 680-85. She diagnosed J.N. with amphetamine use disorder; alcohol use disorder, in

23   early remission; major depressive disorder with psychotic features; r/o schizoaffective,

24   substance/medication induced psychotic disorder, and ADHD. AR 683.  She found mild to

25   moderate impairment in the ability to understand, remember and carry out short and simple

26   instructions; moderate to marked impairment in the ability to understand, remember and carry out

27   detailed instructions; moderate impairment in the ability to maintain adequate pace and persistence

28   to perform simple tasks; moderate to marked impairment in the ability to maintain adequate pace

and persistence to perform detailed tasks; marked impairment in the ability to adapt to changes in job routine; marked impairment in the ability to withstand the stress of a routine work day; and marked impairment in the ability to interact appropriately with co-workers, supervisors and the public on a regular basis. AR 684.

### 4. Dr. Patterson (state agency consultant, non-examining)

On December 3, 2015, non-examining state agency psychological consultant, Helen C. Patterson, PhD, conducted a review of the record and found Plaintiff to have moderate limitations in the following categories: the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms; the ability to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to respond appropriately to changes in the work setting. AR 175. Dr. Patterson concluded "the preponderance of objective evidence shows this [claimant] to have adequate mental capacity to sustain work-like activities, when sustaining abstinence from drug use." *Id.* Dr. Patterson also indicated, "Substance abuse is documented, but a [drug and alcohol abuse] material determination is not required." AR 176.

### 5. J. Lake (residential rehabilitation director)

In a 2-page letter dated November 15, 2017, Julie Lake, the executive director of Archway, a men's drug and alcohol treatment/recovery program, described J.N.'s participation in the program she runs between September 7, 2017 to October 22, 2017. AR 479-480. Ms. Lake noted, "[J.N.] was unable to receive treatment here for longer than 6 weeks, due to a combination of extreme ADHD and his rage issues." AR 479. Ms. Lake wrote that J.N. was disruptive and argumentative and that he derailed the class or group, making it impossible for the teacher to continue. *Id.* When he was asked to leave the group or class, he would "rage and yell and slam the door on his way out." *Id.* Similarly, he would "lose control of his temper and have arguments with staff or other residents" between classes. *Id.* According to Ms. Lake, it took J.N. "hours to calm down after one of his outbursts, but when he did he would always apologize and be remorseful[,]" making it clear that "his outbursts were not intentional and that he simply had no control over them." *Id.* She writes, "It became obvious after a very short time that [J.N.] was

1    deeply damaged by his childhood and by the drugs that had been a part of his life since he was a

2    child." AR 479.

3                    **6.  Dr. Aames (treating psychologist)**

4         On January 26, 2018, Ted Aames, PhD completed a Mental Impairment Questionnaire

5    based on four visits, beginning on April 20, 2017. AR 1584-91. Dr. Aames diagnosed: Major

6    depressive disorder severe recurrent with psychotic features; and amphetamine-type substance use.

7    AR 1585. He found marked limitations in the ability to understand, remember and apply

8    information; interact with others; and adapt or manage oneself. AR 1587-88.  He found extreme

9    limitation in the ability to concentrate, persist or maintain pace. AR 1588. He concluded that J.N.

10   would be absent from work at a rate of 4 days or more per month and off-task at a rate of more

11   than 30%. *Id*. He found that J.N.'s symptoms would not significantly improve in the absence of

12   substance use, citing J.N.'s abstinence while incarcerated and his reports that he "struggled daily

13   with symptoms associated with his mental health diagnoses" during these periods. *Id*.  He

14   observed that J.N. had a medically documented history of a mental disorder of at least 2 years'

15   duration accompanied by treatment and/or highly structured settings that diminish symptoms and

16   minimal capacity to adapt to changes not already a part of his daily life. AR 1589.

17                   **7.  Dr. Franklin (state agency consultant, examining)**

18        Lesleigh Franklin, PhD, completed a psychological evaluation of J.N. dated March 25,

19   2018 based on an examination by Nooshin Golshani, PsyD., conducted under Dr. Franklin's

20   supervision, on February 26, 2018.  AR 1905-16. Dr. Franklin reported that J.N. began using

21   drugs when he was around 12 years old. AR 1906. Her diagnostic impression was: Major

22   depressive disorder, moderate, with anxious distress, with psychotic features; ADHD; Intermittent

23   explosive disorder; stimulant use disorder, moderate; PTSD. AR 1912.  She found that J.N. had

24   moderate difficulties in the ability to understand, remember and carry out very short and simple

25   instruction and in the ability to respond appropriately to changes in a routine work setting and deal

26   with normal work stressors. AR 1914. She found marked difficulties in the ability to maintain

27   attention/concentration in two-hour segments and in the ability to maintain regular attendance and

28   be punctual within customary, usually strict tolerances. *Id.* She found extreme impairment in the

United States District Court
Northern District of California

ability to do the following: understand, remember or carry out detailed instructions; perform at a consistent pace without an unreasonable number and length of rest periods; get along with and work with others; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id*.

### 8. Dr. Acenas (state agency consultant, examining)

Antoinette Acenas, M.D., examined J.N. and provided a psychological evaluation dated August 20, 2019. Dr. Acenas found that J.N. continues to abuse alcohol and methamphetamine daily. AR 1926-27. She diagnosed him with polysubstance use disorder. AR 1928. She found that he has no mental impairment. *Id*. She also opined that J.N. was not capable of managing his funds, stating that "[h]e continues to abuse alcohol and drugs and could use the funds unlikely [sic]." AR 1929.

### C.   Hearing Testimony

At the hearing on March 13, 2018, J.N. testified that he had never received vocational training and that he had no significant work experience in the past 15 years. AR 104. He testified that he did not want to admit he had a mental illness because of his pride. AR 105-06. He testified that he is very hyper, aggressive and opinionated, and that he was kicked out of three drug and alcohol treatment programs. AR 107. He testified that he is very irresponsible and forgets things. AR 109. He testified that he used meth on and off for 30 years but that he had spent half of his life incarcerated and that he was abstinent during the years of incarceration. AR 117. He testified that he is a very confrontational person and that sometimes he uses cuss words and loud voices. AR 119-120. He reported having sleep problems; an energy level "through the roof;" inability to focus; inability to concentrate; and an inability to distinguish real voices from imagined voices ("I don't know sometimes if what I'm hearing is real"). AR 125. He testified that meth sometimes helps with his mental health symptoms and that although he tried quitting meth for years he always came back to it because "that's what they give to people for their disorders…" AR 129-130.

At the March 13, 2018 hearing, the ALJ also took testimony from vocational expert

United States District Court
Northern District of California

("VE") Susan L. Creighton-Clavel, who testified that a hypothetical individual of the Plaintiff's age, education and work experience who would have a conflict once a week would be precluded from all work. AR 133. She further testified that a hypothetical individual of the Plaintiff's age, education and work experience who would be absent twice a month would be precluded from all work. AR 134.

At the hearing on December 5, 2019, J.N. testified that he is unable to concentrate or stay focused for more than a minute or two before becoming distracted. AR 67, 84. He testified that he stopped taking a medication in jail due to the side effects. AR 69.  He testified to being an addict and that he was working on getting clean. AR 70. He testified that that he is a hoarder. AR 74. He testified to being regularly 15 to 90 minutes late. AR 77, 86. He testified to being paranoid, having anxiety, hearing voices and being argumentative and irritable. AR 78, 79, 81. J.N. reported that he has problems with short term memory and that he has missed medical appointments for cancer treatment. AR 86.  J.N. testified that reducing his alcohol and meth use "hasn't changed anything." AR 88.

VE Bonnie Drumwright, PhD, testified at the December 5, 2019 hearing.  She testified that a hypothetical individual of J.N.'s age, education and work experience who was limited to less than the full range of medium work and who was late to work every day by at least 15 minutes would be precluded from all work. AR 92. She further testified that a hypothetical individual of J.N.'s age, education and work experience who was limited to less than the full range of medium work and who was consistently absent one day or more per month would be precluded from all work. *Id*.  Finally, she testified that a hypothetical individual of J.N.'s age, education and work experience who was limited to less than the full range of medium work and who was off task 15% of the time would be precluded from all work. AR 94.

### D.    The ALJ's Decision

The ALJ found at step one that J.N. has not engaged in substantial gainful activity since the alleged onset date of December 31, 2003. AR 33.  At step two, he found that J.N. has the following severe impairments: lumbar spine degenerative disc disease; drug and alcohol dependency; depression; and anxiety. *Id.* At step three, the ALJ found that J.N. did not have an

United States District Court
Northern District of California

United States District Court
Northern District of California

1  impairment or combination thereof that met or equaled the severity of an impairment listed in 20

2  CFR Part 404, Subpart P, Appendix I. *Id.*  In connection with his step three finding, the ALJ

3  assessed the degree of functional limitation resulting from J.N.'s mental impairment with respect

4  to his ability to understand, remember, or apply information; his ability to interact with others; his

5  ability to concentrate, persist, or maintain pace; and his ability to adapt or manage himself.

6      The ALJ found that including the substance use disorder, J.N. has no limitation in

7  understanding, remembering or applying information. AR 34. He found that including the

8  substance use disorder, J.N. has a mild limitation in interacting with others. *Id.*

9  He found that including the substance use disorder, J.N. has a marked limitation in concentrating,

10 persisting and maintaining pace, "but the limitation is accommodated and the claimant limited to

11 being late to work by fifteen minutes every day." *Id*. The ALJ found that including the substance

12 use disorder, J.N. has a mild limitation in adapting or managing himself. AR 35. The ALJ went on

13 to find that J.N. did not satisfy the Paragraph C criteria.  *Id.*

14     At step four, the ALJ found that including the substance use, J.N. has the residual

15 functional capacity to perform medium work but would be late work by fifteen minutes every day.

16 AR 36. He further found that including the substance use, there are no jobs that exist that J.N. can

17 perform in light of his age, education, work experience and residual functional capacity. *Id.*  On

18 the other hand, he found that absent the substance use, J.N. has the residual functional capacity to

19 perform medium work and can work as a dishwasher, janitor or laundry worker. AR 48-49.  The

20 ALJ therefore concluded that substance use was a contributing factor material to the determination

21 of disability and that J.N. was not disabled. AR 49.

22 **IV.    ISSUES FOR REVIEW**

23     J.N. contends the ALJ erred in the following respects:

24     1.  The ALJ's finding that J.N.'s drug and alcohol use was material to his disability was

25     not supported by substantial evidence.

26     2.  The ALJ failed to provide specific, legitimate reasons for crediting or rejecting the

27     medical opinions.

28     3. The ALJ's medical severity finding ignores plaintiff's explosive disorder, impulse

control disorder and psychosis.

4. The ALJ erred in evaluating the adult listing of impairments at step three.

5. The ALJ erred in evaluating plaintiff's credibility.

6. The ALJ's RFC findings are not based on substantial evidence.

J.N. contends that the case should be remanded for award of benefits because a finding of disabled would have been required had he applied the correct legal standards and weighed the evidence properly.

## V.    ANALYSIS

### A.    Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).   When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free of legal error and supported by "substantial evidence." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401. (1971).   "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.    Whether ALJ Erred in Finding Substance Use Disorder is Material to Disability

#### 1.   Legal Standard for Reviewing Substance Use Materiality

If an ALJ finds that there is medical evidence of drug addiction or alcoholism ("DAA") and that the claimant is disabled when considering all impairments, including the DAA, the ALJ

1    must determine whether the "drug addiction or alcoholism is a contributing factor material to the

2    determination of disability." 20 C.F.R. § 416.935(a). The key factor in making this determination

3    is whether the claimant would still be found disabled if he stopped using the drug or alcohol. *Id*. §

4    416.935(b)(1). The claimant's drug or alcohol addiction ("DAA") is only a material contributing

5    factor to the determination of disability if the remaining limitations would not be disabling. *Id*. §

6    416.935(b)(3).

7        SSR 13-2p sets forth the standard for determining when DAA is material to a claimant's

8    mental impairment:

9           7. *What do we do if the claimant's co-occurring mental disorder(s)
            improve in the absence of DAA?*

10

11          a. Many people with DAA have co-occurring mental disorders; that
            is, a mental disorder(s) diagnosed by an acceptable medical source in
            addition to their DAA. We do not know of any research data that we
12          can use to predict reliably that any given claimant's co-occurring
            mental disorder would improve, or the extent to which it would

13          improve, if the claimant were to stop using drugs or alcohol.

14          b. To support a finding that DAA is material, we must have evidence
            in the case record that establishes that a claimant with a co-occurring
15          mental disorder(s) would not be disabled in the absence of DAA.
            Unlike cases involving physical impairments, we do not permit
16          adjudicators to rely exclusively on medical expertise and the nature
            of a claimant's mental disorder.

17

18          c. We may purchase a CE in a case involving a co-occurring mental
            disorder(s). We will purchase CEs primarily to help establish whether
19          a claimant who has no treating source records has a mental disorder(s)
            in addition to DAA. See Question 8. We will provide a copy of this
            evidence, or a summary, to the CE provider.
20

21          d. We will find that DAA is not material to the determination of
            disability and allow the claim if the record is fully developed and the
22          evidence does not establish that the claimant's co-occurring mental
            disorder(s) would improve to the point of nondisability in the absence
            of DAA.
23

24   SSR 13-2p, 2013 WL 621536, at *9 (Feb. 20, 2013).

25       Although a claimant with DAA does not have to provide evidence from a period of

26   abstinence to meet their burden of proving disability, *id.* at *4, SSR 13-2p sets guidelines with

27   respect to how periods of abstinence may factor into the materiality analysis where there is such

28   evidence.  It provides:

United States District Court
Northern District of California

> In all cases in which we must consider periods of abstinence, the claimant should be abstinent long enough to allow the acute effects of drug or alcohol use to abate. Especially in cases involving co-occurring mental disorders, the documentation of a period of abstinence should provide information about what, if any, medical findings and impairment-related limitations remained after the acute effects of drug and alcohol use abated. Adjudicators may draw inferences from such information based on the length of the period(s), how recently the period(s) occurred, and whether the severity of the co-occurring impairment(s) increased after the period(s) of abstinence ended. To find that DAA is material, we must have evidence in the case record demonstrating that any remaining limitations were not disabling during the period.

SSR 13-2p(9)(b), 2013 WL 621536, at *12.

"[T]he claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his disability." *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007). Nevertheless, "[a]ll adjudicators must provide sufficient information in their determination or decision that explains the rationale supporting their determination of the materiality of DAA so that a subsequent reviewer considering all of the evidence in the case record is able to understand the basis for the materiality finding and the determination of whether the claimant is disabled." SSR 13-2p(b), 2013 WL 621536, at *2.

### 2. Discussion

The Court concludes that the ALJ committed legal error in his DAA materiality analysis. First, the ALJ's failure to apply the standards set forth in SSR 13-2p for determining the materiality of DAA was legal error and it was prejudicial. Second, the ALJ's conclusion that J.N.'s impairments would improve to the point of nondisability in the absence of DAA is not supported by substantial evidence.

There is no dispute that the medical evidence in the record establishes J.N. has a substance abuse disorder and therefore, that DAA may be a factor in determining disability. Furthermore, the ALJ found that with J.N.'s DAA taken into consideration, he would be disabled because of the limitation in J.N.'s RFC that J.N. would be fifteen minutes late to work every day while using substances ("the lateness limitation"), which the VE testified would preclude all work. AR 36, 39. Therefore, the ALJ was required to conduct a materiality analysis under SSR 13-2p. Instead, the ALJ concluded without any reference to SSR 13-2p that J.N. would *not* be fifteen minutes late to

United States District Court
Northern District of California

work in the absence of his DAA.  Moreover, the ALJ pointed to no medical evidence in support of his conclusion that J.N.'s lateness limitation was caused by J.N.'s DAA.

The ALJ linked the lateness limitation to J.N.'s issues with concentration, persistence and maintaining pace in his Paragraph B analysis, which addressed the limitation in a single sentence. AR 34 ("With regard to concentrating, persisting, or maintaining pace, including the substance use disorder, the claimant has marked limitation, but the limitation is accommodated and the claimant limited to being late to work by fifteen minutes every day.").  Yet the ALJ offered no rationale whatsoever for concluding that this limitation was caused by J.N.'s substance abuse or that it would subside if J.N. did not abuse substances.  The only other mention of the lateness limitation simply states that J.N. testified that he could "not hold on to a job because he is late all the time." AR 36.  While J.N. did testify that he could "never hold down a job because [he is] late all the time," AR 66, he did *not* testify that he was late as result of his drug or alcohol abuse. *See* AR 66, 76-77.  Likewise, nether the ALJ nor the Commissioner has pointed to any evidence in the record linking J.N.'s substance abuse to his difficulty arriving at work on time.

The ALJ's failure to address SSR 13-2p is far from harmless.  That guidance specifically requires the ALJ to provide an explanation of the rationale supporting the ALJ's materiality finding so that a subsequent reviewer can determine whether the rationale is legally sound and supported by substantial evidence.  The ALJ did not provide that explanation, leaving the Court to guess the reasons for his conclusion that the lateness limitation was caused by substance abuse rather than by J.N.'s coexisting mental impairments.  This alone is a sufficient basis to reverse the decision of the Commissioner. Further, to the extent that the ALJ appears to have relied on his conclusions that J.N. had "many negative and normal status findings" while incarcerated and "had counseling while in jail but not medication[,]" AR 44, which could go to the limitations associated with J.N.'s mental impairments (as opposed to his DAA) under SSR 13-2p(9)(b), these findings are not supported by substantial evidence.

As to J.N.'s "normal" status findings, cited by the ALJ and repeated by the Commissioner in her summary judgment motion, the ALJ mischaracterizes a number of the treatment notes he points to and ignores altogether evidence reflecting that J.N.'s mental impairments were not, as the

ALJ found, "very consistent and unremarkable" while he was incarcerated (and thus abstinent). AR 45.   As discussed above, the prison mental health records indicate that numerous practitioners over more than two decades observed symptoms of mental illness and that at times J.N. was prescribed medications to address these symptoms.  The ALJ ignored these observations even though they were highly relevant to the question of whether J.N.'s mental impairments persisted even during periods of abstinence.  The Ninth Circuit has warned that ALJs may not engage in such cherry-picking of the record when evaluating a claimant's mental impairments.  *See Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").

Further, to the extent that the ALJ relied on an April 11, 2014 treatment note stating that "substance use appear[ed] to be the primary factor contributing to [J.N.'s] legal, medical and mental health difficulties[,]" his reliance was misplaced as he ignored the statement in the same treatment note that "[w]hile it is unclear what the clinical picture would look like without substance use it seems likely that the [inmate] has a mood disorder, provisionally diagnosed as [Major Depressive Disorder], recurrent, mild."  AR 759.  The ALJ did not acknowledge the equivocal nature of this treatment note,  or explain how this evidence "demonstrates that [J.N.'s mental limitations] were not disabling during the period" while he was incarcerated, as required under SSR 13-2p.

The prejudice to J.N. associated with this error is compounded by the ALJ's failure to address statements by other treatment providers that were inconsistent with the ALJ's interpretation of the April 11, 2014 treatment note stating that J.N.'s symptoms had persisted during periods of abstinence and were unlikely to subside or improve in the absence of substance abuse.  *See* AR 1519 (4/20/2017 treatment note by NP Kevin Lagor that J.N. "has had long periods of sobriety in the past and his [symptoms] of depression and mania persisted"); 1588 (1/26/2018 Mental Impairment Questionnaire completed by treating psychologist Ted Aames opining that J.N.'s mental impairments would not significantly improve in the absence of

1   substance abuse and citing the fact that although J.N. had "long periods of sobriety while

2   incarcerated" "he still struggled daily with symptoms associated with his mental health

3   diagnoses.").

4          Finally, the ALJ's materiality finding appears to rely heavily on the opinions expressed by

5   Ms. Lake, described above, but again, his reliance is misplaced. There is no question that Ms.

6   Lake's letter sheds light on the materiality inquiry. Indeed, SSR 13-2p makes clear that the

7   opinion of such a source – considered an "other nonmedical source" – may be "especially helpful"

8   in making the materiality determination "because it can document how the well the claimant is

9   performing activities of daily living in the presence of a comorbid impairment." SSR 13-2p(8)(3),

10  2013 WL 621536, at *11. The ALJ, however, incorrectly interpreted the letter as describing J.N.'s

11  "respon[se] to situations involving substance abuse[,]" AR 38, even though Ms. Lake made no

12  mention of any substance use while J.N. was in the program and did not even hint that J.N. was

13  using while in the program. To the contrary, the only reasonable interpretation of Ms. Lake's

14  letter is that J.N.'s conduct – including his extreme disruptiveness, inability to get along with staff

15  or other participants in the program and rage – were associated with his mental impairments,

16  rather than substance abuse, and it was because of these symptoms that he was asked to leave the

17  program. While the Court is mindful that it must defer to the Commissioner where there are

18  alternative interpretations of the evidence and both are reasonable, that rule does not apply here

19  because the ALJ's interpretation of Ms. Lake's opinion as to the materiality of J.N.'s substance

20  use simply cannot be squared with the letter itself.

21      **C.   Whether the ALJ Erred in Weighing the Medical Opinions**

22          **1.   Legal Standards Governing Weighing of Medical Evidence**

23          Under the regulations that apply to J.N.'s application for benefits, [8] courts in this circuit

24  "distinguish among the opinions of three types of physicians: (1) those who treat the claimant

25  _____

26  [8] The regulations regarding evaluation of medical evidence have been amended and several of the
    prior Social Security Rulings, including Social Security Ruling 96-2p ("Titles II and XVI: Giving
27  Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims filed
    after March 27, 2017. Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan.
28  18, 2017); see also 20 C.F.R. §§ 404.1520c (a), 416.920c(a). In this case, however, the earlier
    regulations apply because J.N. filed his application for benefits on April 8, 2015.

United States District Court
Northern District of California

(treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); 20 C.F.R. § 416.927(d). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.10.  The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion is not controlling, it is weighed according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. 20 C.F.R. § 404.1527(c)(2)-(6). Where a treating or examining physician's opinion is not contradicted by another doctor, an ALJ may reject it only for clear and convincing reasons that are supported by substantial evidence. *Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (citations omitted). Even when contradicted by another doctor, such opinions may only be rejected for specific and legitimate reasons supported by substantial evidence in the record. *Id.*

### 2.  Discussion

The Court finds that the ALJ's weighing of the medical evidence is characterized by numerous flaws.  It does not attempt to list all of them here but addresses some of the most glaring errors below.

#### a.  Dr. Franklin

As discussed above, Dr. Franklin concluded, based on an examination of J.N., that he had significant limitations related to his mental impairments, including moderate difficulties in the ability to understand, remember and carry out very short and simple instruction and in the ability to respond appropriately to changes in a routine work setting and deal with normal work stressors; marked difficulties in the ability to maintain attention/concentration in two hour segments and in

the ability to maintain regular attendance and be punctual within customary, usually strict tolerances; and extreme impairment in the ability to do the following: understand, remember or carry out detailed instructions; perform at a consistent pace without an unreasonable number and length of rest periods; get along with and work with others; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and complete a normal workday and workweek without interruptions from psychologically based symptoms. AR 1914.

Despite purportedly giving the opinions of Dr. Franklin "great weights", AR 38, the ALJ failed to include any limitations that would take into account these medical opinions in J.N.'s RFC, with or without substance abuse.  As other examining doctors reached different conclusions as to J.N.'s mental limitations, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for disregarding Dr. Franklin's opinions but failed to do so.  As to the omission of any limitations reflecting Dr. Franklin's findings from J.N.'s RFC *without* substance abuse, the ALJ apparently concluded that all of the limitations Dr. Franklin found were entirely the result of substance abuse, noting in passing, that Dr. Franklin had examined J.N. "one day after using substances," AR 38. But the ALJ does not explain how this conclusion was justified in light of the fact that J.N. had told Dr. Franklin that he had not used substances on the day of the examination, AR 1909, there is no suggestion in the report that J.N. was under the influence when he was evaluated, and Dr. Franklin's diagnostic impression based on extensive testing did not attribute any of the areas of impairment that she found to be the result of substance use.

The ALJ also did not explain his failure to include any limitations whatsoever in J.N.'s RFC *with* substance abuse to take into account the significant mental limitations Dr. Franklin found.  Moreover, the reasons the ALJ provided for partially discounting these limitations – J.N.'s "ability to communicate well to medical providers throughout the record, take care of his mother, and represent himself at the hearing," AR 38 – are not supported by substantial evidence.

As to J.N.'s purported ability to "communicate well" to medical providers, the ALJ pointed to no specific examples of this and it is not entirely clear what the ALJ had in mind, given

1    the rage and explosive anger towards patients and staff alike described by Ms. Lake.  Similarly,

2    the ALJ failed to acknowledge Dr. Franklin's note that during her examination of him, J.N. made

3    regular eye contact with her but that it was so "intense" and "angry" that she "questioned him if

4    [her] safety was in danger."  AR 1908.   Nor has the Court found any notes by medical providers

5    observing that J.N. was able to communicate "well" with them.

6         The ALJ also did not point to specific evidence to support his conclusion that J.N. "takes

7    care of his mother."  J.N. did not testify at either of the hearings before the ALJ that he took care of

8    his mother.  J.N. did testify at the December 5, 2019 hearing that he gets into arguments with his

9    mother two or three times a day.  AR 80. The only statement the ALJ cites in his decision (though

10   not in connection with his discounting of Dr. Franklin's opinions) is a statement in a report by one

11   of the state agency consultants, Dr. Rana.  In particular, the ALJ states in a separate section of his

12   decision that J.N. "admitted to Dr. Rana that he helps his mother around the house." AR 42.  But

13   Dr. Rana comes nowhere close to finding that J.N. "takes care" of his mother.  Rather, his report

14   contains only the statement that J.N. "helps [his mother] around the house off and on."  AR 1918.

15   This vague statement does not shed any meaningful light on the specific limitations found by Dr.

16   Franklin or J.N.'s ability to work, giving no indication of the type of work J.N. performed for his

17   mother or its frequency.  Therefore, this is not a specific and legitimate reason for discounting Dr.

18   Franklin's opinions about J.N.'s mental limitation and does not constitute substantial evidence.

19        Finally, the ALJ states that J.N. was able to "represent himself" at the hearing but again

20   mischaracterizes the record.  J.N. was, in fact, represented by counsel at both hearings before the

21   ALJ.  It may be that the ALJ meant that J.N.'s ability to *express* himself at the hearing suggested

22   that his limitations were not as severe as Dr. Franklin's findings suggest.  Indeed, the ALJ states in

23   his decision:

24        > The claimant did not demonstrate or manifest any difficulties
        > concentrating during the hearing. During the time when the claimant
        > was being questioned, the claimant appeared to process the questions
25        > without difficulty, and to respond to the questions appropriately and
        > without delay.

26   AR 41.   In relying on his own observation to determine J.N.'s mental limitations, however, and

27   ignoring the extensive testing conducted by Dr. Franklin to evaluate J.N.'s cognitive limitations,

28

United States District Court
Northern District of California

the ALJ committed an "egregious and important error[ ]." *Garrison v. Colvin*, 759 F.3d 995, 1013

(9th Cir. 2014).  The ALJ is not trained as a psychologist and his observations that J.N. did not

have "any difficulties concentrating during the hearing" and appeared to "process questions

without difficulty" and respond "without delay" do not constitute substantial evidence to support

discounting Dr. Franklin's findings based on a battery of tests – especially where the ALJ found

that Dr. Franklin's opinions generally were entitled to great weight.  *See Perminter v. Heckler*, 765

F.2d 870, 872 (9th Cir. 1985) ("The ALJ''s reliance on his personal observations of [the claimant]

at the hearing has been condemned as "sit and squirm" jurisprudence.").

        Therefore, the ALJ erred in weighing the opinions of Dr. Franklin.

            b.  Dr. Raato

        Like Dr. Franklin, Dr. Ratto conducted extensive testing of J.N.'s cognitive abilities and

concluded that his impairments in a variety of areas of functioning ranged from moderate to

marked, as discussed above.  The ALJ purported to give "great weight" to Dr. Ratto's opinions,

AR 38.  He did not, however, offer any explanation for his failure to account for any of these areas

of impairment in his RFC, whether with substance abuse or without it. Nor does he offer any

explanation for his failure to include any limitations to reflect Dr. Ratto's observation that J.N. had

a "history of depression throughout his life beginning with suicidal thoughts at age 15 and ongoing

problems with anger and being violent including problems 'breaking things.'" AR 681.  In failing

to provide specific and legitimate reasons for disregarding the findings of Dr. Ratto with respect to

J.N.'s functional limitations and their connection to his ongoing mental illness, the ALJ erred.

            c.  Dr. Aames

        The ALJ afforded "little weight" to the opinion of Dr. Aames, characterizing it is

"extreme" and finding that it was "not supported by objective findings" and was "inconsistent

with the record as a whole."  AR 47. In particular, the ALJ pointed to J.N's "mostly normal mental

status examinations as well as normal orientation, memory, insight and judgment and an

appropriate mood and affect." AR 47.  As discussed above, however, the ALJ erred by cherry-

picking occasional normal findings in the record while disregarding extensive evidence of mental

illness over a period of many years and therefore, his finding that Dr. Aames' opinion was

inconsistent with the record as a whole is not supported by substantial evidence.  The ALJ also failed to provide specific and legitimate reasons (or indeed, any reasons at all) for ignoring the finding of Dr. Aames that Plaintiff's co-occurring mental disorders would not improve in the absence of substance use, as discussed above.

### d.  Dr. Acenas

Of all of the psychological consultative examiners to evaluate J.N., Dr. Acenas was the only doctor who diagnosed J.N. exclusively with polysubstance abuse disorder and found no impairments in J.N.'s mental functioning, even though Dr. Acenas observed that J.N.'s mood was "depressed[,]" and her report contains references to J.N.'s "emotional problems" as a child, his psychiatric treatment while in jail, and outpatient psychiatric treatment at the "parole clinic." *See generally*, AR 1926-1929.  The ALJ gave Dr. Acenas' opinion "great weight," offering what appears to be largely boilerplate language.  AR 47 ("This was based on an in-person exam, well-supported by objective, medically acceptable clinical or laboratory diagnostic techniques, the assessment is complete, specific facts are cited upon which the conclusion is based, and is largely consistent with the record as a whole when he is not using substances, as discussed above.").  Yet Dr. Acenas's conclusions are inconsistent with the opinions of every other doctor to have evaluated J.N.'s psychological impairments, all of whom found that he had significant functional limitations due to mental impairments.  The ALJ erred in failing to explain why he gave this outlier opinion great weight and why he adopted Dr. Acenas's conclusion that J.N. had no functional limitations related to his mental impairments over the opinions of doctors who had conducted extensive testing of J.N.'s cognitive functioning and reached the opposite conclusion.

### D.    Remedy

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded."  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

1    rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

2    outstanding issues that must be resolved before a disability determination can be made" and

3    "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a

4    whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017)

5    (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

6    a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

7    case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

8    as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

9    *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and

10   ambiguities." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

11           Here, the ALJ's errors in weighing the medical evidence does not necessarily compel the

12   conclusion that J.N. is disabled as there are some differences between these opinions as to the

13   severity of J.N.'s limitations in the various areas of functioning. Nonetheless, the Court finds that

14   an award of benefits under the credit-as-true rule is warranted based on the ALJ's errors in

15   connection with his treatment of the DAA materiality analysis.   In particular, as discussed above,

16   the ALJ found that DAA was material to J.N.'s disability without conducting any meaningful

17   materiality analysis under SSR 13-2p, which is the primary guidance that governs such an

18   analysis, or addressing the substantial evidence in the record that contradicts his materiality

19   finding. The record has been fully developed, containing extensive records from J.N.'s lengthy

20   periods of incarceration, numerous psychological evaluations, and transcripts from two hearing

21   conducted by ALJ Zeidman.  There appears to be no further development of the record that would

22   be useful. As the ALJ has already found that J.N. is disabled when DAA is taken into account and

23   the record as a whole contains substantial evidence that DAA is not material to J.N.'s mental

24   limitations, the Court finds that J.N. has met his burden in proving disability regardless of

25   substance use and that an award of benefits is appropriate.[9]

26

27   _____

28   [9] Because the Court finds that J.N. is entitled to an award of benefits on the basis of the ALJ's
     errors related to DAA materiality, it declines to reach J.N.'s remaining challenges.

## VI.    CONCLUSION

For the reasons stated above, the Court GRANTS J.N.'s motion for summary judgment, DENIES the Commissioner's motion for summary judgment, reverses the decision of the Commissioner and remands for award of benefits.

**IT IS SO ORDERED.**


Dated:  March 28, 2023

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

26